[L.A. No. 31099. Jan. 24, 1980.]

COUNTY OF LOS ANGELES, Plaintiff,
Cross-defendant and Respondent, v.
SHIRLEY BERK, Individually and as Executrix, etc.,
Defendant, Cross-complainant and Appellant.

CITY OF TORRANCE, Plaintiff and Respondent, v.
SHIRLEY BERK, Individually and as Executrix, etc.,
Defendant and Appellant.

**Counsel**

Fadem, Berger & Norton and Michael M. Berger for Defendant, Cross-complainant and Appellant and for Defendant and Appellant.

John H. Larson, County Counsel, Charles Vinson Tackett, Jennifer Moran, Max E. Truex and William S. Walter, Deputy County Counsel, for Plaintiff, Cross-defendant and Respondent.

Stanley E. Remelmeyer, City Attorney, and A. D. Jack Allen for Plaintiff and Respondent.

Evelle J. Younger and George Deukmejian, Attorneys General, N. Gregory Taylor and Robert H. Connett, Assistant Attorneys General, Katherine E. Stone and Richard D. Sinclair, Deputy Attorneys General, as Amici Curiae on behalf of Respondents.

**Opinion**

MANUEL, J.—In March 1971, the City of Torrance and the County of Los Angeles (County), acting for themselves and as trustees for the

public, brought separate actions to establish a "public beach recreation easement" on certain property owned by Oscar and Shirley Berk, naming as defendants in addition to the Berks certain parties alleged to have security interests in the property. Answers and cross-complaints were filed by the Berks and other defendants. In their answers the Berks asserted a number of affirmative defenses, including estoppel and laches. Their cross-complaints, to the extent that they were directed against plaintiffs,[1] sought declaratory relief negating the existence of the claimed easement and also money damages on theories of slander of title, unjust enrichment, and, with respect to County, inverse condemnation. The actions were consolidated for trial, and after a trial by the court judgments were entered in favor of plaintiffs in all respects. All defendants including the Berks appealed,[2] but all appeals other than that of the Berks were dismissed by the Court of Appeal prior to our granting a hearing. Thus, only the Berk appeal is presently before us.[3]

I

The property here in dispute consists of slightly less than two contiguous acres of vacant shoreline land straddling the boundary line between the Cities of Torrance and Redondo Beach. It includes sandy beach areas (none of which presently extend to the mean high tide line) together with steep slopes and a considerable bluff area overlooking the ocean.[4] Seaward from the property, and surrounding the sandy beach

---

[1]Affirmative relief was also sought against other parties on other grounds. These claims were severed from the main action, to be tried separately, and do not concern us here.

[2]Oscar Berk died during the pendency of the appeal. The sole appellant remaining is Shirley Berk, both in her own behalf and as executrix of the estate of her late husband. We hereafter refer to her as "defendant."

[3]County has filed a motion to dismiss the Berk appeal as well, urging present mootness. It is pointed out that after judgment was rendered certain holders of security interests in the subject property, upon default by the Berks, foreclosed those interests and acquired the Berks' fee interest, which has now been sold to County for an undisclosed amount. Thus, it is urged, appellant Berk lacks any present substantial interest to be adjudicated. It is clear, however, that in spite of these events Berk presently retains such an interest in obtaining monetary redress on equitable grounds under the allegations of her cross-complaint. (See and cf. *Klopping* v. *City of Whittier* (1972) 8 Cal.3d 39, 58 [104 Cal.Rptr. 1, 500 P.2d 1345].) Because a determination of her right to such relief must necessarily involve an examination of the judgments in their entirety, we decline to dismiss her appeal. (Cf. *American Enterprise, Inc.* v. *Van Winkle* (1952) 39 Cal.2d 210, 217-218 [246 P.2d 935], and cases there cited.)

[4]Prior to the completion of a beach-widening project in 1967 and 1968 (see fn. 5, *post*) the seaward border of the property was apparently the mean high tide line, and in winter the sea often reached the base of the cliff or sloping area. Presently the seaward border of the property is not touched by the sea.

portions thereof, is an expanse of what is now public beach. There are no visible artificial boundaries between the subject property and the public beach.

In the 1920's this property, together with an additional parcel lying seaward from the Torrance portion thereof, was acquired by the developer of a neighboring residential area, the Hollywood Riviera tract. In 1928, the developer constructed a large private beach club on the bluff portion of the property for the use of owners of homes in the tract. Following the depression shares in the property were distributed among the Hollywood Riviera homeowners, who in 1947 sold a seaward portion of the property lying in Redondo Beach to County. In 1958, however, the beach club building burned to the ground, and the only evidence of it presently remaining consists of steps leading from the bluff to the beach below.

In 1963, the remaining property was sold to a real estate developer named Keillor, who planned to construct a highrise condominium thereon. He placed a small real estate office on a bluff portion of the property lying in Torrance and commenced a public promotion program designed to persuade local homeowners of the merits of his project. In this, however, he was unsuccessful. Meeting with strong and effective opposition from members of the Hollywood Riviera Homeowners' Association, who wished to maintain the low-density character of the neighborhood, he abandoned the project in Torrance after being denied a variance by the city council in 1964. Thereupon Keillor turned his attention to the development of the bluff portions of the property which lay in Redondo Beach. Pursuant to these plans, in 1965 he negotiated an exchange of parcels with the County, trading a seaward parcel lying in Torrance for the seaward parcel in Redondo Beach which had previously been sold to the County by the former owners of the property.[5] Again, however, his plans miscarried when he failed to obtain financing for the planned Redondo Beach development, and following subsequent difficulties in meeting his financial obligations under secured notes relating to the property, he filed a petition for bankruptcy. In November 1969, after the property had been held in receivership for approxi-

[5]Keillor subsequently granted the County a right of entry over the parcel he obtained in this exchange in order to enable it to replenish and maintain the surrounding public beaches. In 1967 and 1968, he also permitted a private concern to store certain materials on the bluff portion lying in Torrance while it performed a beach-widening project pursuant to a contract between the County and the United States Army Corps of Engineers.

mately one year, foreclosure was effected by one of the trust deed holders, Halperin, who then became the owner.

In 1970, Halperin, seeking to dispose of the property, opened an escrow on the remaining Torrance portion (i.e., the bluff area upon which the bulk of the private beach club had stood) with a group of developers. After it appeared, however, that the group's plans, which contemplated the erection of a high-rise building, would require a density variance, local homeowners again mobilized their efforts, and when in July 1970 the request for variance was denied the escrow was terminated.

In the meantime, defendant Oscar Berk had become aware of the availability of the Redondo Beach portions of the property. After a personal inspection of the property he proceeded to consult county tax records and familiarize himself with applicable zoning and building requirements. In the course of these investigations he was advised of the likelihood of local homeowner opposition to any planned development but was given to understand that any such opposition would probably not affect his plans with respect to Redondo Beach. Upon learning of the termination of the escrow on the Torrance portion of the property, however, he expanded his investigations to include it as well. These soon revealed that homeowner opposition in Torrance was a more significant factor, the Hollywood Riviera Homeowners' Association being composed of Torrance residents. In view of the experience of the previous group of prospective developers he was advised that development would be possible in Torrance only if he could create a plan which would require no variances. Concluding that this was possible, he proceeded to draw plans for a four-story apartment complex utilizing the bluff parcels in both Redondo Beach and Torrance. These plans were presented to officials in both cities. Upon being advised by these officials that his plan would require no variances from applicable zoning and building codes, he submitted an offer on the whole of the property and an escrow was opened.

During the pendency of the escrow Mr. Berk continued his discussions with city officials in both Redondo Beach and Torrance; these discussions were concerned with how, rather than whether, the project should proceed. On September 28, 1970, the escrow closed, and shortly thereafter Berk obtained a building permit from Redondo Beach. In February 1971, construction commenced on the Redondo Beach portion

of the property and Berk applied for a building permit in Torrance. At this point, however, members of the local homeowners' body—who the previous autumn had become aware of the then-recent decision of this court in *Gion* v. *City of Santa Cruz* (consolidated with *Dietz* v. *King*) (1970) 2 Cal.3d 29[6] [84 Cal.Rptr. 162, 465 P.2d 50]—appeared before the Torrance City Council urging that an action be filed by the city to quiet title to public recreational easements on the Torrance portion of the property. On March 13, 1971, the Torrance action was commenced and shortly thereafter the County, after receiving a similar request, filed its own action with respect to the Redondo Beach portion of the property. An injunction was obtained preventing further construction during the pendency of the litigation.

## II

Our decision in *Gion-Dietz* was filed on February 19, 1970, more than six months prior to the opening of the Berk escrow. In that case this court, after examining a number of well-established principles governing the implied common law dedication of public easements in private real property, held that such principles were applicable in the case of shoreline property and that, given certain conditions of public user and owner inaction, a public easement for recreational purposes could arise in such property. The decision received substantial coverage and commentary in the public media and was the subject of considerable attention in legal publications.

The City Attorney of Torrance, although he became aware of the *Gion-Dietz* decision soon after it appeared in the advance sheets, was initially uncertain whether its application in Torrance would be limited to sandy beach areas or would extend as well to slope and bluff areas of beach property. He did not then communicate with the planning and building departments concerning the decision and its possible implications. In June 1970 he assigned a deputy to investigate the possibility of filing actions on beach properties in Torrance, and in September of the same year he recommended to the city council that actions be commenced on certain shoreline properties to establish public recreational easements therein. However, no action was recommended concerning the Torrance portion of the property here in question because the depu-

---

[6]Hereafter, in referring to our decision in the consolidated cases of *Gion* v. *City of Santa Cruz* and *Dietz* v. *King,* we shall adopt the hyphenated usage which has become customary among commentators, bench, and bar: *Gion-Dietz.*

ty who prepared the letter seeking authorization for suit was under the impression that the parcel in question was county property.

Mr. Berk did not learn of the *Gion-Dietz* decision until late October or early November 1970, when he was informed of it by his engineer. By this time, of course, the escrow had closed. None of the officials in Redondo Beach or Torrance with whom he had dealt prior to and during the escrow had advised him of the decision or of the effect which it might have on the subject property.

## III

There was ample evidence presented at trial concerning public recreational use of the property here in question. That evidence, viewed in a light most favorable to the prevailing parties, established in general that the whole of the subject property (excepting, for the 30-year period between 1928 and 1958, the site on which the beach club building stood) has been subject to public recreational use of substantial diversity and scope for several decades. The present sandy beach portion of the property (contained within the parcel which was in County ownership from 1947 to 1965) has been used along with the adjoining beach area by thousands of persons annually—persons engaged in all of the recreational pursuits generally associated with the seashore. The area sloping up toward the bluff—most notably that containing the stairs from the old beach club—has been used for access to the beach below. The bluff area, lying largely in Torrance, has been used by the public for a great variety of purposes, including enjoyment of the spectacular marine view, photography, painting, dog-walking, picnicking, bicycling, and the parking of vehicles. Occasional efforts on the part of former owners, including the posting of signs and the erection of chain barriers, has had little effect upon what one witness referred to at trial as "the multitudes," and after the 1958 clubhouse fire no fencing of any kind was attempted.

There was also evidence that for 25 years preceding 1970, the County maintained the property as if it were publicly owned, cleaning it regularly of the debris generated by public use and providing lifeguard services on the beach area.

On the basis of the foregoing evidence the trial court concluded in substance that the whole of the property in question was subject to an

easement arising out of implied dedication for public recreational purposes.[7] It also concluded that neither plaintiff was guilty of laches or should be estopped from asserting the claim of public right. With respect to defendants' cross-complaints the court concluded that no provision of the state or federal Constitutions had been violated by plaintiffs, that no act amounting to slander of title had occurred, and that inverse condemnation had not resulted from plaintiffs' actions. Judgments were entered declaring the existence of the said public easement; quieting title thereto in plaintiffs for themselves and as trustees for the people; enjoining defendants from all construction or other conduct which would interfere with or obstruct the full use and enjoyment of the public easement; and ordering that defendants take nothing by their cross-complaints.

## IV

Defendant Shirley Berk, the sole appellant herein (see fn. 2, *ante*), raises several arguments challenging the trial court's application of *Gion-Dietz* to the instant case. It is urged in essence (1) that *Gion-Dietz* may not constitutionally be applied to a case such as that at bench in which the facts giving rise to the asserted public easement antedated the *Gion-Dietz* decision; (2) that even if it can be so applied, *Gion-Dietz* should not be read to permit the establishment of a public easement on the basis of "mere public use" for the requisite period but should instead be interpreted to require a specific finding of adversity or claim of public right; (3) that settled rules of property governing the acquisition of prescriptive interests preclude the application of *Gion-Dietz* in the instant circumstances; and (4) that considerations of fundamental fairness, among them those shaping the doctrines of laches and estoppel, will not allow the result reached below. Sensible of the significance of these contentions—and of the interest of the bench and bar of this state in obtaining guidance relative to the matter of the implied dedica-

---

[7]The court in its findings undertook to assign various time periods during which the easement had been perfected with respect to the several constituent parcels. It was found and concluded that implied dedication had occurred with respect to those portions of the property which had been the site of the beach club house (i.e., the entire Torrance portion and that part of the bluff area lying in Redondo Beach) "during the period commencing on a date subsequent to September 25, 1958 [the date of the club house fire], but prior to November 1, 1958, and ending on or by November 1, 1963." The sandy beach and slope portion lying in Redondo Beach, on the other hand, was found to have been dedicated "during the period September 7, 1965 [the date it was received by Keillor in exchange for the similar parcel to the south of it] to September 28, 1970 [the date of the closing of the Berk escrow]."

tion of public recreational easements—we take up each of them in order.

## A. *"Retroactive" application.*

■ Defendant Berk, characterizing the *Gion-Dietz* decision as "revolutionary," urges that to apply its precepts to a case such as that at bench, wherein the events giving rise to the alleged dedication occurred prior to our decision, results in an unconstitutional taking of property. She recognizes, of course, that the *Gion* and *Dietz* cases themselves were based on events similarly situated in time, but she urges that the principle of *Stovall v. Denno* (1967) 388 U.S. 293, 301 [18 L.Ed.2d 1199, 1206, 87 S.Ct. 1967]—pursuant to which a new rule of law, although applied to the parties before the court in the case establishing it, may be limited to otherwise prospective application—should here have application to preclude an unconstitutional result. In view of significant reliance by former owners of the property here in question upon rules of public dedication in existence prior to the *Gion-Dietz* decision, it is argued, it is those rules, and not the precepts of *Gion-Dietz,* which must here apply.

We think it clear that defendant may properly raise this contention. Although the *Gion-Dietz* decision became final several months *prior* to the opening of the subject escrow, this fact cannot preclude Mrs. Berk from challenging a dedication to the public which occurred, if at all, at a time substantially previous to that decision. Even if it must be presumed—contrary to the record herein—that Mr. and Mrs. Berk acted with full knowledge of *Gion-Dietz,* and even if it be granted that they were on notice of substantial past and present use of the subject property by the public, these factors are in no way inconsistent with defendant's present position. If the principle of *Gion-Dietz* may not be constitutionally applied to allegedly dedicatory events and circumstances occurring previous to our decision, defendant's knowledge—presumed or otherwise—becomes a matter of little consequence, for the property passed to her free of any public easement.

Passing on to the merits of the contention, however, we find ourselves unable to accept its major premise—i.e., that the *Gion-Dietz* decision marked so "revolutionary" a change in the law that to apply its precepts to past events and actions, occurring in the context of prior law, is to countenance an unconstitutional taking of property without due process

of law. We conclude on the contrary that *Gion-Dietz*, far from signaling the momentous "redefinition of property rights" which defendant would depict,[8] simply represents a restatement and clarification of well-established former law and an application of that law, as so restated and clarified, to a unique pattern of factual circumstances. Such a decision, we think, cannot be deemed to so betray the legitimate and reasonable reliance interests of property owners that its application to them and their property amounts to an unconstitutional taking of vested rights.

As early as 1854 this court, in addressing the matter of common law dedication of property to the public, indicated that such a dedication might occur not only by deed or other action so manifesting dedicatory intention on the part of the owner but by "lapse of time." (*San Francisco* v. *Scott* (1854) 4 Cal. 114, 116.) In a series of subsequent cases it was made clear that dedication arising out of "lapse of time," in the words of *Scott,* was to be distinguished from dedication arising from dedicatory acts or conduct by the owner in that it looked not to the intentions of the owner but to the intent and activities of the public on the land in question; here the inquiry became whether the public, through long-continued "adverse" use of the property, had so manifested its public aspect as to justify the implication in law that a dedication had occurred. (See especially *Schwerdtle* v. *County of Placer* (1895) 108 Cal. 589, 592-596 [41 P. 448]; see also *Hartley* v. *Vermillion* (1903) 141 Cal. 339, 348-349 [74 P. 987]; *People* v. *Myring* (1909) 144 Cal. 351, 354 [77 P. 975]; *Hare* v. *Craig* (1929) 206 Cal. 753, 757 [276 P. 336]; *Diamond Match Co.* v. *Savercool* (1933) 218 Cal. 665, 669-670 [24 P.2d 783].) Our 1954 opinion in *Union Transp. Co.* v. *Sacramento County* (1954) 42 Cal.2d 235 [267 P.2d 10], which drew upon all of

---

[8]Defendant's characterization of the *Gion-Dietz* decision appears to have been shared in substance by the authors of several of the comments appearing in legal literature shortly after its rendition. (See, e.g., Note, *This Land Is My Land: The Doctrine of Implied Dedication and Its Application to California Beaches* (1971) 44 So.Cal.L.Rev. 1092; Note, *The Common Law Doctrine of Implied Dedication and Its Effect on the California Coastline Property Owner* (1971) 4 Loyola L.A.L.Rev. 438; Lascher, *Highlighting the California Law Reviews* (1971) 46 State Bar J. 13, 16-17; Berger, *Nice Guys Finish Last—At Least They Lose Their Property: Gion* v. *City of Santa Cruz* (1971) 8 Cal.Western L.Rev. 75; Armstrong, *Gion* v. *City of Santa Cruz: Now You Own It—Now You Don't* (1970) 45 L.A. Bar Bull. 529; but see Comment, *Public Access to Beaches* (1970) 22 Stan.L.Rev. 564.) More recent commentary, however, has adopted a somewhat different view, tending to view *Gion-Dietz* as a predictable development and elaboration of established law. (See Briscoe & Stevens, *Gion After Seven Years: Revolution or Evolution?* (1977) 53 L.A. Bar J. 207; Gallagher, et al., *Implied Dedication: The Imaginary Waves of Gion-Dietz* (1973) 5 Sw.U.L.Rev. 48.)

these as well as other cases, identified this form of dedication as one implied in law, as opposed to those forms resting upon the acts or acquiescence of the owner, which it characterized as implied in fact. (*Id.*, at p. 241.)

Our *Gion-Dietz* case, adverting to this venerable line of authority, went on to distinguish the character of "adversity" necessary to implied in law dedication to the public from that obtaining in the law of private prescriptive rights, pointing out that what must be shown here is not a personal claim of right but rather a use by members of the public "believing the public had a right to such use." (2 Cal.3d 29, 39.) Here again we did not purport to announce "new law" but rather to consolidate and explain prior expressions and holdings. Indeed, as long ago as 1908 it had been explained that in such cases the public was not required "to make proclamation that they are using [the subject property] under a claim of right where the right is asserted as flowing from long usage with the knowledge and acquiescence[9] of the owner of the land; nor is it always necessary to show some aggressively hostile act by the public that such use was intended to be adverse to the owner. The claim of right, the adverse character of the use and the knowledge and acquiescence[10] of the owner of the land may be presumed from the facts and circumstances attending the use." (*Barnes* v. *Daveck* (1908) 7 Cal.App. 487, 490-491 [94 P. 779]; see also *Laguna Beach* v. *Consolidated Mtg. Co.* (1945) 68 Cal.App.2d 38, 43-44 [155 P.2d 844].)

It is suggested, however, that the form of dedication to the public here in question had, prior to *Gion-Dietz,* always been limited in application to cases involving roadways, and that the possible application of these principles to other types of property could not reasonably have been anticipated. In responding to this argument, however, we need look no further than the case of *Morse* v. *Miller* (1954) 128 Cal.App.2d 237 [275 P.2d 545], wherein the court, relying significantly upon the very portion of the *Union Transportation* opinion which we summarized in *Gion-Dietz,* concluded that the trial court's finding of public dedication of beach front and athletic field property could be supported on the theory, among others, of implied in law dedication arising from long-

[9]In the case of *Hare* v. *Craig, supra,* 206 Cal. 753, at page 755, we had indicated that the owner's "knowledge and acquiescence" did not imply permission or license in this context but rather suggested the absence of any significant acts by the owner "which would interrupt the continuity of the adverse use...."

[10]See footnote 9, *ante.*

continued adverse public use. The *Morse* decision, cited in *Gion-Dietz* (2 Cal.3d at p. 43), antedated it by almost 16 years.

Defendant makes much of the case of *F.A. Hihn Co.* v. *City of Santa Cruz* (1915) 170 Cal. 436 [150 P. 62], urging in essence that it and later cases following it had the effect of lulling beachfront landowners into a false sense of security by assuring them that failure to object to public use of their lands would not lead to a presumed intention on their part to create public rights therein. As we pointed out in *Gion-Dietz,* however, the case of *O'Banion* v. *Borba* (1948) 32 Cal.2d 145 [195 P.2d 10] made clear that future cases were to be decided not from the standpoint of presumptions but from that of "the sufficiency of the evidence in the light of all the circumstances disclosed." (32 Cal.2d at p. 150.) More significantly, perhaps, the landowner relying on *Hihn* and related cases, whatever comfort he may have derived from them with respect to implied in fact dedication arising from his own act, could not reasonably have read them to suggest that they precluded the emergence of public rights in his property due to long-continued public use—i.e., through a dedication implied in law. Not only was the subject language clearly dictum in the *Hihn* case itself (see 170 Cal. at p. 447), but the issue there addressed was that of dedication by the owner through acts manifesting a dedicative intent—i.e., implied in fact dedication.[11]

We conclude on the basis of the foregoing that our *Gion-Dietz* decision had none of the "revolutionary" aspects which defendant would ascribe to it. Not only were the principles upon which it relied firmly imbedded in prior decisional law, but they had previously been applied on at least one occasion to property of the general character here involved. It thus cannot be maintained that the application of these principles on the basis of facts taking place previous to *Gion-Dietz* resulted in an unconstitutional taking of property.

We reject for similar reasons defendant's related contention that a "mutual mistake of law" vitiated any donative intent on the part of prior owners. As we have pointed out, the principles of implied in law

---

[11]This was made quite clear in the subsequent case of *Manhattan Beach* v. *Cortelyou* (1938) 10 Cal.2d 653 [76 P.2d 483], where we cited *Hihn* as a clear illustration of the principle that "Acts of a landowner from which the law implies a dedication of his property for public use as a street do not always lead to the same result where land is used for other purposes." (*Id.*, at p. 667.)

dedication to public use look not to the intent of the owner but to the intent and activities of the public.

## B. *Public intent.*

It is urged that the judgments cannot stand because they are unsupported by a specific finding that the public's use of the subject property was accompanied by a belief on its part that it had a right to such use. The trial court specifically found, however, that the uses made of the subject property by the public were made "as if said parcels were part of a public recreational area." This, under the specific terms of our *Gion-Dietz* decision, was a sufficient finding of that kind of "adversity" which is requisite to implied in law dedication. (2 Cal.3d at p. 39.)

Defendant also argues that the evidence before the court cannot be read to support such a finding of public interest. Without detailing the evidence upon which she relies, we can adequately characterize it as indicating that during the periods of time in which public dedication was held to have occurred no reasonable member of the public could have concluded that the subject property was publicly owned. Even if we ignore all contrary evidence, however—including that of public maintenance of the property—the fact remains that knowledge of private *ownership* is not inconsistent with a belief in a right to public *use*. No case has ever suggested that the public, in order to bring about the implication of public rights upon private land, must act in the belief that the land is in public ownership. It is enough that the public demonstrate through its actions that its members believed that they had a right to use the property as they did.

We do not here suggest—nor have we ever in the past suggested—that the requisite belief on the part of the public, as manifested by its actions with respect to the property, is not subject to the requirement of reasonableness in all of the circumstances. Thus if the owner can show that his efforts to exclude the public or otherwise discourage public use were such that the public was effectively put on notice that its use of the property was not authorized, he may thereby preclude the accrual of public rights. This question, however, is ordinarily one of fact, to be determined in light of all of the circumstances. (See *Gion-Dietz, supra,* at p. 41.) In the instant case the trial court found on the basis of substantial evidence "that no effective effort was made by any owner or anyone else to interfere with or halt such use by said members of the general public at any time."

### C. *Third party interests; the effect of receivership.*

Defendant advances several technical arguments based upon the presence of secured interests in the subject property and the placing of a portion thereof in receivership. ▮ It is urged (1) that no rights of a "prescriptive" character could accrue to the public in the presence of deeds of trust affecting the subject property; (2) that even if such rights could accrue in these circumstances, they were here cut off prior to perfection by the occurrence of foreclosure sales; and (3) that the placing of a portion of the subject property in receivership during the "prescriptive" period cut off all inchoate public rights or at least had a fatal tolling effect with respect to their perfection.

We think it important before addressing each of these contentions separately to draw attention to a fundamental misconception which runs through all of them. We deal here not with a form of prescription or adverse possession but with a unique form of *dedication.* Here the element of "adversity" is looked to not as a factor necessary to the perfection of a superior property right in the possessor or possessors as such (i.e., in themselves) but rather as an ingredient in the evidentiary structure necessary to the implication in law that a dedication to the public as a whole has occurred. (See 3 Miller & Starr, Current Law of Cal. Real Estate (rev. ed. 1977) § 20:13, p. 475.) When that structure is made to appear the public is not deemed to have wrested its right from the owner but rather is held in law to have been granted it by him. Thus, the true questions facing us are (1) whether such a dedication may be made through legal implication in the face of deeds of trust affecting the subject property; (2) whether foreclosure and sale under such deeds of trust prior to the time when dedication would otherwise be implied operates to prevent such dedication on the part of the new record owner; and (3) whether the placing of the property in receivership operates to remove the period of such receivership from consideration with respect to the implication of dedication on the part of present or future record owners.

While we are aware of no case which discusses the effect of the presence of deeds of trust affecting the subject property on its implied in law dedication to public use, there are two cases which bear indirectly on the problem. In *People* v. *Myring, supra,* 144 Cal. 351, this court held that long-continued public uses of a roadway and bridge situated on land held by defendant pursuant to a federal patent had resulted in

their implied in law dedication to public use. When it was objected that such a dedication could not be so implied because the property was held under a declaration of homestead giving rights therein to defendant's wife, we responded as follows: "If the prosecution had sought to show a dedication by deed from him alone, this objection might have been good . . ., but the dedication which is presumed from the adverse user by the public operated as an estoppel against the wife as well as the husband, and was independent of any question of homestead." (*Id.*, at p. 355.)

A parallel result was reached in the case of *Gray* v. *Magee* (1933) 133 Cal.App. 653 [24 P.2d 948]. There a certain roadway long dedicated to public use had been rerouted shortly before the death of the owner of the property over which it passed. The question was whether the relocated portions of the roadway were subject to implied in law dedication through continued public user of them during the pendency of the owner's estate, it being urged in essence that the executors of the estate had no power to make any kind of dedication contrary to the interests of the beneficiaries. We disagreed with this contention. "Without doubt," the court said, "an executor may not make an express dedication as to estate lands, but an easement may arise as to estate lands through implied dedication or prescription." (*Id.*, at p. 662.)[12]

What these cases would seem to indicate is that a dedication implied in law as a result of adverse public user arises "independently" of third party interests in the property. This is so, we believe, because of the character of the public user which underlies any such dedication. Such user must be substantial; it must be carried on by diverse members of the public; and it must be "adverse" in the sense that we have explained. Such user must be held to impart notice of its occurrence to the whole world, including the holders of other interests in the property.

---

[12]The court cited by way of analogy the early case of *Patchett* v. *Pacific Coast Ry. Co.* (1893) 100 Cal. 505 [35 P. 73], a case involving an easement by prescription over trust lands. There this court, addressing the effect of the trustee's failure to bring an action within the statutory period upon infant beneficiaries, quoted with approval from earlier authority as follows: "'The rule that the statute of limitations does not bar a trust estate holds only between *cestui que trust* and trustee, not as between *cestui que trust* and *trustee* on one side, and *strangers* on the other; for that would make the statute of no force at all, because there is hardly any estate of consequence without such trust, and so the act would never take place. . . .'" (100 Cal. at p. 510; original italics.) (See also *Triplett* v. *Williams* (1969) 269 Cal.App.2d 135, 137-138 [74 Cal.Rptr. 594]; Rest.2d Trusts, § 327, p. 125.)

It is objected that the holder of a deed of trust on property subject to public user of the nature here in question, even if he is deemed to be on notice of it, is wholly without power to discourage or prevent it. This, however, does not appear to be so. Under the provisions of section 2929 of the Civil Code, one whose interest in property is subject to a deed of trust is precluded from doing any act which will substantially impair the security of the beneficiary of the deed of trust. (See *Cornelison* v. *Kornbluth* (1975) 15 Cal.3d 590, 599 [125 Cal.Rptr. 557, 542 P.2d 981].) Such acts, we believe, must be held to include that of permitting public user of the character here in question, and we see no reason why such a beneficiary may not maintain an action to prevent its continuance. (See Code Civ. Proc., § 526, subd. 2; *Lavenson* v. *Standard Soap Co.* (1889) 80 Cal. 245 [22 P. 184]; *Perrine* v. *Marsden* (1867) 34 Cal. 14; *Buckout* v. *Swift* (1865) 27 Cal. 433; *Robinson* v. *Russell* (1864) 24 Cal. 467.)

The case of *Phillips* v. *Laguna Beach Co.* (1922) 190 Cal. 180 [211 P. 225], upon which defendant strongly relies, is of little assistance to her. There the owner of beachfront property had, by resolution of its board of directors, offered to dedicate a portion of it along the shoreline to public use for park purposes. Subsequent public use was apparently not intense and occurred on a less than regular basis, but it was held that such use was sufficient to constitute an acceptance by the public of the offered dedication. We also held, however, that the judgment— which enjoined future sale or encumbrance—could not be sustained as to the beneficiary of a trust deed who had made a loan on the property some 10 years after the offer of dedication was made. Nothing of record had alerted the beneficiary of the prior dedication and, we noted, a view of the premises at the time of the loan had revealed no significant evidence of public use. "There is no evidence that the public were occupying the public use at the time of the visit of the [beneficiary], *nor that it ever had occupied any part of the premises so as to impart notice to the [beneficiary]*. . . ." (190 Cal. at p. 185; italics added.) Thus it is clear that even had this case involved implied in law dedication (which it did not, being concerned with express dedication), and even if it had addressed the question of the effectiveness of such dedication in the presence of existing deeds of trust (which it did not, any dedication therein having occurred long prior to the inception of the deed of trust), it suggests only that sparse public user of the type therein involved was not such as to impart notice of its occurrence. We deal here with an entirely different situation, involving substantial, diverse, and readily apparent public user over a considerable period of time.

We conclude on the basis of the foregoing that public user of the character involved in the instant case must be held to impart knowledge of its occurrence to the world at large, and that when it has continued for the requisite period of time a dedication to the public will be implied in law which binds not only record owners but all persons having interests in the subject property—including the beneficiaries of deeds of trust in existence during the said period.

We are further of the view that the occurrence of foreclosure and sale during the course of the dedicatory period should lead to no different result. Although the purchaser at such a sale will normally receive title free and clear of any unrecorded interests or liens (see 1 Miller & Starr, Current Law of Cal. Real Estate (rev. ed. 1975) § 3:121, p. 544), and although no rights of a prescriptive or adverse nature can arise against him prior to sale and the expiration of the period of redemption (see 3 Miller & Starr, Current Law of Cal. Real Estate, *supra,* § 19:25, pp. 431-432), we believe that the unique form of notice imparted by public user of the character here in question should operate to burden the title received by the purchaser with all accumulated public interests, even if they not be ripened into an implied dedication at the time he receives title. Accordingly, dedication may in some circumstances be implied in law on the part of such a purchaser even when he has not been record owner for the full length of the dedicatory period.

■ The fact that the subject property was in federal receivership during a portion of the period of public user did not in our view operate to cut off accumulated public interests or remove the period of receivership from consideration for purposes of implied dedication to public use. The order appointing receiver, in enjoining all persons "from interfering with the Receiver's possession of the assets . . . and from attempting in any manner to take possession" of said assets without court order, was intended "to preserve the estate or prevent loss thereto" (11 U.S.C.A. § 11(a)(3)) pending disposition pursuant to the chapter XI proceedings which led to its issuance. (See generally, 2 Cowans, Bankruptcy Law and Practice (2d ed. 1978) § 606, pp. 263-266; 1 Clark, The Law and Practice of Receivers (3d ed. 1959) § 74, pp. 100-101.) It did not purport to enjoin the public from continuing its long-established uses of the property—at least insofar as such uses did not result in "loss" to the estate during the period of receivership. We therefore see no reason why continued public user occurring during the subject period should be disregarded or omitted from consideration with respect to a dedication implied in law after the termination of the receivership.

## D. *Estoppel and laches.*

■ Defendant contends that plaintiffs should be estopped from claiming the public recreational easement here found to exist by the trial court. It is urged that the County, by assessing and taxing the property as if it were private and not subject to such an easement, and the officials of the Cities of Redondo Beach and Torrance by applying their zoning and building ordinances to the property on the same assumption, thereby represented to defendant and her husband that the said assumption was true. The Berks, it is argued, relied on this representation to their detriment.

We see no merit in this argument. The trial court found, on the basis of substantial evidence, that plaintiffs lacked any actual knowledge that a public easement existed on the subject property, that they at no time acted with an intent to deceive the Berks or any of their predecessors in this respect, and that they were guilty of no culpable negligence in treating the property as they did. Moreover, any reliance by the Berks on the actions of the governmental entities here involved was clearly unreasonable. It simply cannot be maintained that an existing or prospective property owner, upon being advised by planning and building officials that a given project complies with applicable local codes, thereby gains the right to proceed with that project regardless of the rights of third parties or the public in the property on which it is proposed to be built. Finally, any such reliance must also be deemed unreasonable in light of the Berks' knowledge of the long-continued public user of the property—the *Gion-Dietz* decision having been rendered by this court five months prior to the opening of escrow.

It is suggested that there is some inherent inconsistency in a determination that whereas governmental officials were not culpably negligent in treating the property as if it were not burdened with a public easement, the Berks and others in the chain of title acted other than reasonably in relying on such treatment in their own assessment of the status of the property. The short answer to this, of course, is that the owner of property or one proposing to acquire it cannot justify his ignorance of the true state of the facts and the law affecting it by pointing to similar ignorance in government bodies. Negligence which may be less than culpable in a government body, charged with the administration and regulation of vast amounts of land under diverse ownership, cannot be so easily excused in one whose interest is focused upon a particular piece of property.

Even if the elements of estoppel[13] here appeared—which as we have indicated they do not—this is not a case in which an estoppel could properly be raised against the government and the people to defeat a claim of public recreational easement. It is well established that an estoppel will not be raised against such parties when to do so would nullify "a strong rule of policy, adopted for the benefit of the public, . . ." (*County of San Diego* v. *Cal. Water etc. Co.* (1947) 30 Cal.2d 817, 829-830 [186 P.2d 124, 175 A.L.R. 747]; cf. *City of Long Beach* v. *Mansell, supra,* 3 Cal.3d 462, 493-501. As we pointed out in *Gion-Dietz,* there is a clearly enunciated public policy in this state in favor of allowing public access to shoreline areas. (2 Cal.3d at pp. 42-43.) To allow the raising of an estoppel to defeat the claim of public right here involved would be manifestly contrary to this policy.

Considerations identical to the foregoing support the trial court's refusal to permit the assertion of the equitable defense of laches. (See *People* v. *Department of Housing & Community Dev.* (1975) 45 Cal.App.3d 185, 196 [119 Cal.Rptr. 266], and cases there cited.)

## V

■ Defendant additionally asserts that the trial court erred in denying recovery in damages under the cross-complaints directed against the governmental plaintiffs. It is urged that the failure of these entities to act more promptly in light of *Gion-Dietz* with respect to the property here in question—whether by advising interested parties of its possible status under that decision or by expeditiously filing an action to establish the public claim of easement—resulted in their purchase of the property and subsequent losses. These losses, she asserts, should be recoverable against the entities who, by bringing these actions subsequent to the purchase, brought them about.

---

[13]As we pointed out in *City of Long Beach* v. *Mansell* (1970) 3 Cal.3d 462, 490 [91 Cal.Rptr. 23, 476 P.2d 423], quoting from an early case: "'[T]o the application of this principle with respect to the title of property, it must appear, *first,* that the party making the admission by his declarations or conduct, was apprised of the true state of his own title; *second,* that he made the admission with the express intention to deceive, or with such careless and culpable negligence as to amount to constructive fraud; *third,* that the other party was not only destitute of all knowledge of the true state of the title, but of the means of acquiring such knowledge, and *fourth,* that he relied directly upon such admission, and will be injured by allowing its truth to be disproved.'" (Original italics.) We went on to point out in *Mansell* that the third of these requirements has been interpreted to mean that a person seeking to raise an estoppel in this context be destitute not "'of all possible means of acquiring knowledge of the true state of the title, but rather of all convenient or ready means to that end.'" (*Id.,* at pp. 490-491.)

The sole authority advanced in support of this novel proposition—and that only by way of analogy—is the case of *Klopping* v. *City of Whittier, supra,* 8 Cal.3d 39. We there held that a property owner who can demonstrate that his land has suffered a diminution in value "as a result of" unreasonable precondemnation actions on the part of a public authority—such activities there alleged to involve unreasonable delay of an eminent domain action following the prior announcement of intent to condemn—is entitled to recover his consequent losses from the public authority. (See especially *id.*, at pp. 51-52.) It is suggested that here, by the same token, the governmental plaintiffs were guilty of "unreasonable conduct" in treating the subject property without respect to any possible claim of public easement and dealing with its prospective owners on the sole basis of their right to develop it under applicable zoning and building ordinances, only to reverse this position after the purchase had occurred by maintaining the instant actions to establish a public easement. This conduct, defendant asserts, resulted in the losses suffered by them due to the subsequent establishment of the easement.

The suggested analogy, we think, is manifestly overbroad. Even if it be assumed for purposes of argument that the actions of the governmental agencies here involved were "unreasonable" in some sense—a fact which the instant record can by no means be said to establish as a matter of law (see part II, *ante*)—we cannot conclude that the losses accruing to defendant from the purchase of the subject property occurred "as a result of" such governmental actions within the meaning of *Klopping*. In the latter case the property owner, faced with the condemner's intention to proceed and its failure to institute proceedings, was wholly without means for averting the diminution in value which ensued.[14] Here, on the other hand, the situation was quite different. Defendant and her late husband, as prospective purchasers of the subject property, had at their disposal ample means of informing themselves of all of the considerations, legal and otherwise, which might have had an effect on the wisdom of their decision. Rather than availing themselves of the full range of these means, however, they apparently chose to limit their inquiry to those considerations relating to the feasibility of proceeding with their plans in light of applicable zoning and building codes. In so doing they wholly neglected to inform themselves on the current state of the common law and its possible effect on the property they proposed to purchase. Had they done otherwise, of course, they

---

[14]As we pointed out in the *Klopping* case, such a means was later provided by the 1971 addition of former section 1243.1 (now § 1245.260) to the Code of Civil Procedure.

would quickly have been made aware of our then recent *Gion-Dietz* decision and the principles on which it was based.

Defendant would seem to suggest, however, that the governmental plaintiffs herein were under an obligation to advise her and her husband in this matter, and that it is the breach of this obligation which resulted in her losses. We do not believe, however, that defendant may so easily divert the responsibility for her own inattention. We are aware of no authority which requires a government entity, on pain of an award of damages against it, to furnish a legal opinion concerning the possible effect of an appellate decision to persons proposing to purchase property whose title may be affected thereby.

## VI

We close with a formal matter. As has been indicated above, the judgments herein quieted title in the subject public easement in plaintiffs both for themselves and as trustees for the people. Although we have concluded that plaintiffs have standing to assert the public right as trustees for the people, we see no basis in this record for determining that they have any rights in the subject easement other than those which they are adjudged to hold as public trustees.[15] We so interpret and construe the judgments. (See and cf. *In re Marriage of Epstein* (1979) 24 Cal.3d 76, 87-89, 92 [154 Cal.Rptr. 413, 592 P.2d 1165].)

The motion of County to dismiss the appeal herein is denied. The judgments, which we interpret and construe to quiet title in the subject public easement in plaintiffs as trustees for the people of the State of California, are and each of them is affirmed.

Bird, C. J., Tobriner, J., Mosk, J., Richardson, J., and Newman, J., concurred.

**CLARK, J.**—I dissent.

*Gion-Dietz (Gion* v. *City of Santa Cruz* (1970) 2 Cal.3d 29 [84 Cal.Rptr. 162, 465 P.2d 50]) declared substantial law without adequate discussion, repudiated settled principles applicable to claims of dedication by adverse use, ignored constitutional guarantees of property

---

[15]County, of course, presently is the holder of fee title to the underlying real property. (See fn. 3, *ante.*)

rights, established an inequitable doctrine punishing the unselfish, and promulgated a rule counterproductive to the policy sought to be served. The Legislature repudiated *Gion-Dietz* in large part. We should acknowledge the court's mistake and overrule the case.

Prior to *Gion-Dietz* no case held dedication of an easement occurred by adverse use for recreation, and substantial reason existed to believe that use could ripen into fee title only following compliance with statutory requirements for adverse possession. All cases had rejected claims a right to recreational use was acquired by prescription. Because the undefined public easement for recreation would deprive an owner of practically all use of his land, a dedication for recreational use would be equivalent to transfer of the fee. Civil Code section 802 enumerating servitudes which may be granted upon land does not include a recreational easement. In cases involving implied and express dedication of an interest in land for use as a park, courts had always held the full fee interest was transferred, the owner losing all right to possession. Finally, deeds purporting to create public easements for park purposes were held to convey fee interest so that grantors or their successors were precluded from making any use of the property, even one consistent with the purported easement, such as selling refreshments. (E.g., *Slavich v. Hamilton* (1927) 201 Cal. 299, 305-306 [257 P. 60]; *Archer v. Salinas City* (1892) 93 Cal. 43, 51 [28 P. 839]; *Morse v. E.A. Robey & Co.* (1963) 214 Cal.App.2d 464, 469-470 [29 Cal.Rptr. 734].)

The combination of statutory exclusion, park dedication cases, and denial of owner use, told us that a general public right to use private property for recreational purposes could not be acquired by prescription but rather only by compliance with requirements of adverse possession —substantial enclosure, cultivation, or improvement of the property. (Code Civ. Proc., § 325.)

Prior to *Gion-Dietz,* public use of open and unenclosed land was considered a license from the owner rather than an intention to dedicate. The presumption of license applied "where the user by the public is not over a definite and specified line, but extends over the entire surface of the tract. [Citation.] It will not be presumed, from mere failure to object, that the owner of such land so used intends to create in the public a right which would practically destroy his own right to use any part of the property. [Citations.]" (*F.A. Hihn Co. v. City of Santa Cruz* (1915) 170 Cal. 436, 448 [150 P. 62].) Like *Gion-Dietz, Hihn* involved public

use of beach property. But the court concluded that the public did not obtain rights by adverse use or dedication. *Hihn* was followed in *Manhattan Beach* v. *Cortelyou* (1938) 10 Cal.2d 653, 668 [76 P.2d 483]; *Whiteman* v. *City of San Diego* (1920) 184 Cal. 163, 172 [193 P. 98]; and *City of San Diego* v. *Hall* (1919) 180 Cal. 165, 167-168 [179 P. 889].

A different rule was applied to roads where public use for more than the prescriptive period with knowledge of the owner and without permission or objection established dedicatory intent by the owner. (*Union Transp. Co.* v. *Sacramento County* (1954) 42 Cal.2d 235, 240-241 [267 P.2d 10] (citing numerous cases).) In road cases the public ordinarily is deemed to make the same use as the owner, the road is sharply defined and determination of a prescriptive right of way has not been deemed to deprive the owner of all use of his property. Additionally, roads are often expressly dedicated to the public. (O'Flaherty, *This Land Is My Land: The Doctrine of Implied Dedication and Its Application to California Beaches* (1971) 44 So.Cal.L.Rev. 1092, 1101-1102.) Finally, road use is often adverse to the owner either because the road is built by others or because others' use of an existing road increases the owners' burdens of repair and maintenance.

*Hihn* and similar cases placed the burden on those claiming dedication by prescription to negate the presumed license by showing circumstances in addition to mere public use. To establish dedication by prescription prior to *Gion-Dietz,* all cases required continuous use and many required the use be adverse. (*Id.*)

In *Gion-Dietz,* this court announced a new doctrine of public easement for recreational use acquired by prescription. The court ignored the purported easement was equivalent to transfer of fee and did not even discuss requisites of obtaining title by adverse possession.[1] Absence of such an easement from the enumeration of easements in section 802 and the park purpose cases were dismissed in a cryptic footnote. (2 Cal.3d 29, 44-45, fn. 3.)

*Gion-Dietz* utilized the rule theretofore applied to road easement cases to establish dedication of open and unenclosed property. The presumption that public use of such property was derived by license from

[1]A private easement for recreational purposes obviously would not have the effect of transferring fee.

the owner was for the first time rejected, and the burden was placed on the landowner to establish the license. Further, the court held the fact use permission was given to some but not to all members of the public was insufficient to establish the license. (2 Cal.3d at p. 44.)

The court proclaimed: "We will not presume that owners of property today knowingly permit the general public to use their lands and grant a license to the public to do so." (2 Cal.3d at p. 41.) The court concluded that if "the owner has not attempted to halt public use in any significant way...it will be held as a matter of law that he intended to dedicate the property or an easement therein to the public, and evidence that the public used the property for the prescriptive period is sufficient to establish dediction." (*Id.*)

*Gion-Dietz* also repudiated the requirement of continuity in favor of sporadic use. (2 Cal.3d at p. 40.) And the traditional requirement of adversity was expressly eliminated, mere public use now being sufficient. "What must be shown is that persons used the property believing the public had a right to such use. This public use may not be 'adverse' to the interests of the owner in the sense that the word is used in adverse possession cases. If a trial court finds that the public has used land without objection or interference for more than five years, it need not make a separate finding of 'adversity' to support a decision of implied dedication." (2 Cal.3d at p. 39.)

Repudiation of prior authority and change from a doctrine based on adverse use to one of simple use was grounded on the court's announced preference for public recreation. (2 Cal.3d at pp. 42-43.) The court ignored the prohibition against taking property for public use without just compensation reflected in the Fifth and Fourteenth Amendments to the United States Constitution and article I, section 14 of our state Constitution.

Commentators' reaction to the per curiam opinion was immediate and striking. Edward L. Lascher, writing in the State Bar Journal called it a "bombshell." (46 State Bar J. 13, 16 (1971).) Assistant Attorney General Shavelson, head of the land law section, termed it an "earthquake of major proportions in California real property law." (Shavelson, *Gion* v. *City of Santa Cruz: Where Do We Go From Here?* (1972) 47 State Bar J. 415.) With characteristic precision and understatement, Bernard E. Witkin referred to the decision as "innovative,"

pointing to critical commentary and immediate legislative repudiation. (3 Witkin, Summary of Cal. Law (1973) pp. 1834-1836.)

Commentators were severe in their criticism of *Gion-Dietz,* noting not only departure from precedent,[2] the failure to consider total loss to the owner, and the prohibition of taking property without compensation, but also that the case created an obvious inequity and would prove counterproductive to the public policy espoused. (Armstrong, *Gion v. City of Santa Cruz; Now You Own It—Now You Don't; or The Case of the Reluctant Philanthropist* (1970) 45 L.A. Bar Bull. 529; Berger, *Nice Guys Finish Last—At Least They Lose Their Property: Gion v. City of Santa Cruz* (1971) 8 Cal.Western L.Rev. 75; Comment, *This Land Is My Land: The Doctrine of Implied Dedication and Its Application to California Beaches* (1971) 44 So.Cal.L.Rev. 1092; Comment, *Implied Dedication: A Threat to the Owners of California's Shoreline* (1971) 11 Santa Clara Law. 327; Comment, *Public or Private Ownership of Beaches: An Alternative to Implied Dedication* (1971) 18 UCLA L.Rev. 795; Note, *Californians Need Beaches—Maybe Yours!* (1970) 7 San Diego L.Rev. 605; Note, *Implied Dedication in California: A Need for Legislative Reform* (1970) 7 Cal.Western L.Rev. 259; Note, *The Common Law Doctrine of Implied Dedication and Its Effect on the California Coastline Property Owner* (1971) 4 Loyola L.A.L. Rev. 438; Note, *Public Access to Beaches* (1970) 22 Stan.L.Rev. 564; Note (1971) 59 Cal.L.Rev. 231.)

The inequity addressed by commentators appears when weighing penalties against rewards to landowners having no immediate use for their

---

[2]The majority's attempted reliance in the instant case upon *O'Banion v. Borba* (1948) 32 Cal.2d 145 [195 P.2d 10] and *Morse v. Miller* (1954) 128 Cal.App.2d 237 [275 P.2d 545], to establish precedent for *Gion-Dietz* fails. *O'Banion* neither mentions nor impliedly overrules *Hihn. O'Banion* was a prescriptive easement case dealing with roads in which the court did away with the presumption of adversity arising from open, continuous, notorious and peaceable use for the prescriptive period in favor of treating the issue as "one of fact, giving consideration to all the circumstances and the inferences that may be drawn therefrom." (*Id.,* at p. 149.) *Hihn,* which is not mentioned in *O'Banion,* involved a presumption of license where public use is over open land, not a roadway. Moreover, *O'Banion* did not specifically address the issue of burden of proof of license, and did not suggest that the landowner had the burden to prove license rather than a burden to prove adversity upon those claiming public use.

*Morse* recognized a recreational beach easement but the easement was *implied in fact* rather than prescriptive. In that case, a subdivider selling lots represented that the beach and athletic field would be open to use, and the court held that his statements constituted an implied dedication. While the court earlier in its opinion spoke of prescriptive dedication, this was by way of illustration, and furnishes no basis for a conclusion that mere use is sufficient to obtain a prescriptive recreational easement.

property so that permitting public use poses no interference or impairment. Those landowners who were neighborly and hospitable in permitting public use were penalized by *Gion-Dietz* by loss of their land, while those excluding the public by fencing or other means were rewarded by retention of their exclusive use. While virtue is usually its own reward, the law does not usually penalize the virtuous.

The decision was asserted to be counterproductive because landowners to avoid prescriptive dedication would now exclude the public from using open and unimproved property for recreation purposes. Thus the very policy sought to be furthered would be defeated. (*County of Orange v. Chandler-Sherman Corp.* (1976) 54 Cal.App.3d 561, 564 [126 Cal.Rptr. 765] points out that one of the reactions to *Gion-Dietz* was "soaring sales of chain link fences.")

The Legislature quickly and decisively repudiated the factual assumption of *Gion-Dietz*. (Stats. 1971, ch. 941, p. 1845.) Whereas in *Gion-Dietz* this court announced, "We will not presume that owners of property today knowingly permit the general public to use their lands and grant a license to the public to do so" (2 Cal.3d at p. 41), the Legislature concluded that California landowners are far more charitable and neighborly. Following our 1970 opinion in *Gion-Dietz,* the Legislature expressly stated in 1971 that: "The Legislature finds that: (1) It is in the best interests of the state to encourage owners of private real property to *continue* to make their lands available for public recreational use...." (Civ. Code, § 1009, subd. (a); italics added.) Further findings by the Legislature make it abundantly clear we should not require property owners, by rules creating prescriptive dedication, to become less charitable and neighborly.[3]

---

[3]Civil Code section 1009 provides: "(a) The Legislature finds that: [¶] (1) It is in the best interests of the state to encourage owners of private real property to continue to make their lands available for public recreational use to supplement opportunities available on tax-supported publicly owned facilities. [¶] (2) Owners of private real property are confronted with the threat of loss of rights in their property if they allow or continue to allow members of the public to use, enjoy or pass over their property for recreational purposes. [¶] (3) The stability and marketability of record titles is clouded by such public use, thereby compelling the owner to exclude the public from his property. [¶] (b) Regardless of whether or not a private owner of real property has recorded a notice of consent to use of any particular property pursuant to Section 813 of the Civil Code or has posted signs on such property pursuant to Section 1008 of the Civil Code, except as otherwise provided in subdivision (d), no use of such property by the public after the effective date of this section shall ever ripen to confer upon the public or any governmental body or unit a vested right to continue to make such use permanently, in the absence of an express written irrevocable offer of dedication of such

Additional provisions of section 1009 and the 1971 amendment to Civil Code section 813 (Stats. 1971, ch. 941, § 1, p. 1845) clearly reflect the legislative judgment that the policy of public access to recreational areas is best served by encouraging landowners to allow the public to use their land. Section 1009, subdivision (b), provides: "...except as otherwise provided in subdivision (d), no use of such property by the public after the effective date of this section shall ever ripen to confer upon the public or any governmental body or unit a vested right to continue to make such use permanently, in the absence of an express written irrevocable offer of dedication of such property...." Subdivi-

---

property to such use, made by the owner thereof in the manner prescribed in subdivision (c) of this section, which has been accepted by the county, city, or other public body to which the offer of dedication was made, in the manner set forth in subdivision (c). [¶] (c) In addition to any procedure authorized by law and not prohibited by this section, an irrevocable offer of dedication may be made in the manner prescribed in Section 7050 of the Government Code to any county, city, or other public body, and may be accepted or terminated, in the manner prescribed in that section, by the county board of supervisors in the case of an offer of dedication to a county, by the city council in the case of an offer of dedication to a city, or by the governing board of any other public body in the case of an offer of dedication to such body. [¶] (d) Where a governmental entity is using private lands by an expenditure of public funds on visible improvements on or across such lands or on the cleaning or maintenance related to the public use of such lands in such a manner so that the owner knows or should know that the public is making such use of his land, such use, including any public use reasonably related to the purposes of such improvement, in the absence of either express permission by the owner to continue such use or the taking by the owner of reasonable steps to enjoin, remove or prohibit such use, shall after five years ripen to confer upon the governmental entity a vested right to continue such use. [¶] (e) Subdivision (b) shall not apply to any coastal property which lies within 1,000 yards inland of the mean high tide line of the Pacific Ocean, and harbors, estuaries, bays and inlets thereof, but not including any property lying inland of the Carquinez Straits bridge, or between the mean high tide line and the nearest public road or highway, whichever distance is less. [¶] (f) No use, subsequent to the effective date of this section, by the public of property described in subdivision (e) shall constitute evidence or be admissible as evidence that the public or any governmental body or unit has any right in such property by implied dedication if the owner does any of the following actions: [¶] (1) Posts signs, as provided in Section 1008, and renews the same, if they are removed, at least once a year, or publishes annually, pursuant to Section 6066 of the Government Code, in a newspaper of general circulation in the county or counties in which the land is located, a statement describing the property and reading substantially as follows: 'Right to pass by permission and subject to control of owner: Section 1008, Civil Code.' [¶] (2) Records a notice as provided in Section 813. [¶] (3) Enters into a written agreement with any federal, state, or local agency providing for the public use of such land. [¶] After taking any of the actions set forth in paragraph (1), (2), or (3), and during the time such action is effective, the owner shall not prevent any public use which is appropriate under the permission granted pursuant to such paragraphs by physical obstruction, notice, or otherwise. [¶] (g) The permission for public use of real property referred to in subdivision (f) may be conditioned upon reasonable restrictions on the time, place, and manner of such public use, and no use in violation of such restrictions shall be considered public use for purposes of a finding of implied dedication."

sion (d) permits dedication by prescription where governmental entities have improved, maintained or cleaned the land by expenditure of public funds. Thus, the general rule in California is again that, absent public improvement or maintenance, the gracious landowner who permits the public to use his property is in no worse position than he who excludes the public.

While section 1009, subdivision (e), exempted from subdivision (b)'s prohibition of prescriptive dedication certain oceanside properties, subdivision (f) provides: "No use, subsequent to the effective date of this section, by the public of property described in subdivision (e) shall constitute evidence or be admissible as evidence that the public or any governmental body or unit has any right in such property by implied dedication if the owner does any of the following actions." Included in the actions an owner may take are posting signs disclaiming dedication once a year or more, publish disclaimer notices annually, or record a disclaimer revocable notice pursuant to Civil Code section 813. These provisions make clear that contrary to *Gion-Dietz,* owner conduct is not to be ignored in determining prescriptive dedication.

At the time *Gion-Dietz* was decided Civil Code section 813 provided the owner of property could protect his interest by recording a notice providing that the right of the public or any person to use the property was by permission. Recordation of such notice constituted evidence of permissive use. *Gion-Dietz* ignored this section. The 1971 amendment made the recordation conclusive evidence of permission, and further provided the permission "may be conditioned upon reasonable restrictions on the time, place, and manner of such public use, and no use in violation of such restrictions shall be considered public use for purposes of a finding of implied dedication."

Not only has the Legislature rejected the *Gion-Dietz* assumptions but it has also rejected our proclamation that public use alone without regard to landowner conduct is sufficient to warrant a finding of prescriptive dedication. As to the noncoastal properties, prescriptive dedication is available only where governmental agencies have improved, maintained or cleaned the land by expenditure of public funds. As to the coastal properties, landowners may easily avoid the effect of *Gion-Dietz* by recording notices, or annually posting or publishing notices.

For the future all that remains of *Gion-Dietz* as to coastal properties is a trap for the unwary landowner, the one unaware of his right to record, post or publish notice. We should recognize this court's mistake and eliminate the trap by overruling *Gion-Dietz*.

Appellant's petition for a rehearing was denied March 13, 1980, and the opinion was modified to read as printed above. Clark, J., was of the opinion that the petition should be granted.