JOHNSON, J.,
Dissenhng.—I respectfully dissent.
The majority opinion not only distorts but also changes the law of implied dedication to reverse the trial court’s judgment in favor of Friends of the Hastain Trail and Mountains Recreahon and Conservation Authority (MRCA) (collectively, Friends). The opinion bases its conclusions on factual assumptions not supported by the record, decides issues Coldwater Development *1042 LLC and Lydda Lud, LLC (collectively, Hadid), did not raise at trial or on appeal, and gets our standard of review backward, all to reach a result precluded by proper application of established law and unsupported by the trial court’s findings of fact. The result of the majority’s revisionist approach to this case is that much of the “Hastain Trail,” which has been used by the public for more than 50 years and which I believe the trial court correctly found was impliedly dedicated to the public at least 44 years ago, will now be lost forever to public use.
In Gion v. City of Santa Cruz (1970) 2 Cal.3d 29 [84 Cal.Rptr. 162, 465 P.2d 50] (Gion), the California Supreme Court concluded that an implied dedication of private land (three parcels of land on a shoreline, and a beach and the road leading to it) for public use occurred when the public had made use of the land for more than hve years without objection by the owners. “[U]se by the public for the prescriptive period without asking or receiving permission from the fee owner [and] no evidence that the respective fee owners attempted to prevent or halt this use” meant “as a matter of law that a dedication to the public took place.” (Id. at p. 44.) “What must be shown is that persons used the property believing the public had a right to such use. This public use may not be ‘adverse’ to the interests of the owner in the sense that the word is used in adverse possession cases. If a trial court finds that the public has used land without objection or interference for more than hve years, it need not make a separate finding of ‘adversity’ to support a declaration of implied dedication.” (Id. at p. 39.) “Litigants . . . seeking to show that land has been dedicated to the public need only produce evidence that persons have used the land as they would have used public land,” in the case of a beach or shoreline, “as if it were a public recreahon area,” and if a road, “as if it were a public road.” (Ibid.) The evidence must demonstrate that various groups of persons, not “a limited and definable number of persons,” have used the land “ ‘when they wished to do so without asking permission and without protest from the land owners.’ ” (Id. at pp. 39^-0.) “If the fee owner proves that use of the land fluctuated seasonally, on the other hand, such a showing does not negate evidence of adverse user.” (Id. at p. 40.)
“For a fee owner [during the five-year prescriptive period] to negate a finding of intent to dedicate based on uninterrupted public use for more than hve years ... he must either affirmatively prove that he has granted the public a license to use his property or demonstrate that he has made a bona fide attempt to prevent public use. Whether an owner’s efforts to halt public use are adequate in a particular case will turn on the means the owner uses in relation to the character of the property and the extent of public use. Although ‘No Trespassing’ signs may be sufficient when only an occasional hiker traverses an isolated property, the same action cannot reasonably be expected to halt a continuous influx of beach users to an attractive seashore property. ... If the owner has not attempted to halt public use in any significant *1043 way, however, it will be held as a matter of law that he intended to dedicate the property or an easement therein to the public, and evidence that the public used the property for the prescriptive period is sufficient to establish dedication.” (Gion, supra, 2 Cal.3d at p. 41.)
‘“Most of the case law involving dedication in this state has concerned roads and land bordering roads. [Citations.] This emphasis on roadways arises from the ease with which one can define a road, the frequent need for roadways through private property, and perhaps also the relative frequency with which express dedications of roadways are made.” (Gion, supra, 2 Cal.3d at p. 41.) Implied dedication rules apply with equal force, however, to purposes other than a roadway, such as parkland, athletic fields, and beaches. {Ibid.) ‘“This court has in the past been less receptive to arguments of implied dedication when open beach lands were involved than it has [been] when well-defined roadways are at issue,” but increased urbanization, the intensification of land use, and the public policy in favor of expanding public access to shoreline areas ‘“leads us to the conclusion that the courts of this state must be as receptive to a finding of implied dedication of shoreline areas as they are to a finding of implied dedication of roadways.” (Id. at p. 43.)
‘“The present fee owners of the lands in question have of course made it clear that they do not approve of the public use of the property. Previous owners, however, by ignoring the wide-spread public use of the land for more than five years have impliedly dedicated the property to the public. Nothing can be done by the present owners to take back that which was previously given away. In each case the trial court found the elements necessary to implied dedication were present—use by the public for the prescriptive period without asking or receiving permission from the fee owner. There is no evidence that the respective fee owners attempted to prevent or halt this use. It follows as a matter of law that a dedication to the public took place.” (Gion, supra, 2 Cal.3d at p. 44.)
After its partial abrogation by the enactment of Civil Code section 1009, Gion, supra, 2 Cal.3d 29 continues to apply to implied dedication claims preceding March 4, 1972. (Friends of the Trails v. Blasius (2000) 78 Cal.App.4th 810, 822 [93 Cal.Rptr.2d 193] (Blasius).)
The majority opinion purports to follow Gion, supra, 2 Cal.3d 29, but in reversing the trial court’s judgment in favor of judgment in favor of Friends the majority reinvents the law of implied dedication.
I. No “fire road’’ easement prevents implied dedication.
The majority concludes that the lower portion of the Hastain Trail (Trail) runs over a fire road (the intended meaning of that term is undefined in the *1044 record),[1] and therefore that portion of the Trail cannot be subject to implied dedication to the public. (Maj. opn., ante, at pp. 1033-1034.) But “[m]ost of the case law involving dedication in this state has concerned roads and land bordering roads.” (Gion, supra, 2 Cal.3d at p. 41.) In Burch v. Gotnbos (2000) 82 Cal.App.4th 352 [98 Cal.Rptr.2d 119], the trial court found implied dedication to the public of a one-lane dirt fire road constructed in the 1930’s under licenses between the original landowners and the Department of Forestry (which stopped maintaining the fire road sometime in the early 1970’s) based on three witnesses’ testimony of public recreational use of the fire road before 1972. (Id. at pp. 356, 358.) The landowners at the time of trial appealed, arguing that the trial court erred in admitting evidence of the public use of the fire road, and contending that the evidence did not support dedication sufficient to permit the respondent’s logging operations. (Id. at p. 355.) The appellate court applied Gion, supra, 2 Cal.3d 29, concluded ‘“substantial evidence supports the finding of an implied dedication,” and remanded to the trial court to determine whether logging operations were within the scope of the resulting public easement over the fire road. (Burch, at p. 355; see id. at pp. 361-363.) An existing fire road—even one that was under license with a public agency during the dedication period—is not an obstacle to establishing implied dedication, and public recreational use of a fire road may result in dedication to the public outlasting the fire road itself.
Further, the majority’s factual statement gives the existence of a fire road unjustified prominence and a certainty unsupported by any substantial evidence in the record. Throughout the trial, witnesses (including the legacy hikers and experts on aerial photography) described the Trail as running in large part on a fire road with no definition of the term. Some witnesses used the terms fire road and Hastain Trail interchangeably. Where the Trail coincided with a fire road, the wider path meant better defined images of that portion of the Trail on aerial photographs. Additional testimony focused on a narrower peak Trail that ran from the lower portion of the trail to a medallion at the summit. The trial court’s statement of decision includes these factual findings: ‘“The Trail consists of an old fire road leading from Lake Drive up the hill until very near the peak. At that point, the Trail veers east from the fire road up to the peak. The fire road is to the west of the peak. To avoid confusion, the term ‘Trail’ shall refer to the entire trail from Lake Drive to the peak. The term ‘Fire Road’ shall refer to that portion of the Trail which is the old fire road. The Fire Road is that portion of the survey, attached as exhibits A and B, of the Trail which is 15 feet wide.” (I will use the terms “Trail,” “Fire Road,” and “Peak Trail” as did the trial court.) The Fire Road was constructed by 1940 to replace a fire road or fire break that went over the peaks of several hills and was abandoned, becoming overgrown where not *1045 used by hikers. The court found: ‘“[T]he public use of the Trail was open and obvious. The existence of the Fire Road by itself across the properties should have put any prudent owner or purchaser on inquiry as to the use of the Fire Road, and any reasonable inquiry or observation would have disclosed the public use of the Trail.” ‘“Near the summit, the Peak Trail branches off east from the Fire Road. Based on the aerial photographs and the testimony of the legacy hikers, it is clear that the public hiked to the peak along the Peak Trail and therefore had to use the Fire Road to get there.” Hadid’s 2004 grading created a slight modification to the Peak Trail which meant “hikers must now travel a little further up along the Fire Road” to access the Peak Trail.
The majority makes unsupported appellate findings of fact regarding the Fire Road. “Absent exceptional circumstances, no such findings should be made. [Citation.] There are no exceptional circumstances in the instant case.” (Tyrone v. Kelley (1973) 9 Cal.3d 1, 13 [106 Cal.Rptr. 761, 507 P.2d 65].) The record does not contain any legal description of the Fire Road, any recorded easement related to the Fire Road, or any testimony from a fire department or from an expert on fire roads. No evidence whatsoever establishes which fire department created the Fire Road, or the status of the Fire Road during the five-year implied dedication period from March 1967 to March 1972. Hadid had the burden to present evidence at trial of any preexisting easement on the Hastain Trail that would defend against implied dedication, but he presented none. Hadid did not request factual findings regarding the Fire Road or argue at trial or on appeal that the presence of the Fire Road was dispositive of the status of the Trail. When invited to submit supplemental briefing on the issue, Hadid provided no evidence suitable for judicial notice regarding the Fire Road. Just as there is no evidence that there was a fire road easement in place on the Fire Road during the dedication period, there is no evidence regarding if and when any such easement was created or abandoned.
Despite this complete dearth of evidence, the majority inexplicably concludes that there was a “public easement” on the Fire Road throughout the five-year implied dedication period and therefore the legacy hikers’ use of the Fire Road could not have put the property owners on notice of possible dedication of the Trail to the public for recreational use. This edict must be seen and highlighted for what it is—judicial fiat; it is legally wrong and unsupported by facts in the record.
The majority cites Los Angeles Municipal Code (Mun. Code) sections providing that the fire chief can create and maintain fire roads when necessary to protect life and property, and such roads are “granted to the City without cost as easements from a public street or alley to the required terminal point.” (Mun. Code, § 57.503.1.6.; see maj. opn., ante, at p. 1030.) The majority can point to no evidence that the Fire Road was created pursuant to the Municipal Code, *1046 or that the Fire Road continued to be such a fire road during the dedication period. Even if such evidence existed, by the terms of the Municipal Code any resulting easement would have been granted to the city, not to the general public, for the purpose of allowing the city access to fight fires. The majority also errs in stating, without factual or legal support, that a fire road easement granted to the city would allow the underlying property owners to reasonably contemplate that the general public would use the fire road for hiking and dog walking. (Maj. opn., ante, at p. 1031.) As far as I can tell, there is no basis for this conclusion other than the mere prestidigitation of a justice’s pen. There was no testimony to this effect. Consistent passage by hikers on a fire road would serve as notice to a landowner that the road was being used as a hiking trail, and as I explain more fully below, would be adverse to the private landowner for the purposes of implied dedication. (See Burch v. Gombos, supra, 82 Cal.App.4th at p. 355.)
Even if the record contained evidence that the city had been granted an easement over the Fire Road that was in place during the five-year dedication period, the hikers’ use of the Fire Road was adverse to the owners of the private property underlying the Fire Road and continuous use would have given the owners notice that the Fire Road was being used as a hiking trail.[2] “It is established law that one, while recognizing a superior title or right in a governmental entity, may nevertheless adversely possess land as against others,” including those holding the private fee interest underlying a government easement. (Abar v. Rogers (1972) 23 Cal.App.3d 506, 513 [100 Cal.Rptr. 344].) And as any easement for fire control purposes would be the city’s, not the general public’s, the use the legacy hikers and others made of the Trail could not and did not constitute increased use by the holder (a public agency or public entity) of a fire road easement.
In Blasius, supra, 78 Cal.App.4th 810, private landowners appealed from a judgment concluding that under Gion, supra, 2 Cal.3d 29 the public acquired by implied dedication an easement on a road for “ ‘walking, jogging, riding bicycles and horses, and fishing in the Rattlesnake Canal,’ ” subordinate to an existing written easement of record in favor of the Nevada Irrigation District, which maintained and operated the canal area for irrigation purposes. (Blasius, at p. 819.) The canal consisted of a ditch 16 feet wide and an adjacent berm. Atop the berm was a nine-foot-wide road used and maintained by the irrigation district for canal access, maintenance, and repair. The landowners holding the underlying fee interest blocked the canal road with a locked gate at each end of the section of the road on their land, allowing access only to themselves and the irrigation district, and Friends of the Trails filed a *1047 complaint against the landowners and the district to quiet title to a public easement for recreational purposes. At trial, witnesses testified that “ ‘various people, young and old’ ” used the canal road from the 1940’s to 1971 for jogging, walking, riding bicycles or horses, fishing, and walking to and from school and other places, all believing (as did the hikers in this case) that it was a public right of way. (Blasius, at pp. 817-819.) The appellate court approved the trial court’s application of Gion to a claim of implied public “dedication of rights-of-way for pedestrian, equestrian, and bicycle travel” on the road, as “[wjell within the . . . reach of the common law of dedication is the establishment of a public footway. [Citations.] There is no principled basis for not applying the rule of implied dedication to any ‘highway,’ within the generic usage of that term, to all sorts of public ways, e.g., to a bridle way, bicycle path, or any combination of such use as a right-of-way.” (Blasius, at p. 824.) Characterizing “ ‘adversity’ ” in implied dedication cases as “whether ‘persons have used the land as they would have used public land,’ ” Blasius concluded that Gion “plainly contemplates that ‘adversity’ for purposes of implied dedication may arise as to recreational pedestrians in rural areas.” (Blasius, at pp. 824-825.) While “ ‘an occasional hiker traversing] an isolated property’ ” might not be sufficient for implied dedication, “a long history of continued passage by a diverse group of occasional hikers across a well defined privately owned trail segment leading to a network of trails, say on a public wilderness area, might suffice.” (Id. at pp. 825-826 & fn. 7.) The court also rejected the argument that a public easement established by implied dedication was precluded by the preexisting easement in a public entity (the irrigation district), as the district did not show the easements were incompatible. (Id. at p. 826.)
Blasius, supra, 78 Cal.App.4th 810 affirmed a judgment finding implied dedication to the public for recreational purposes over privately owned property, on an access road governed by a written easement belonging to a public entity that used and maintained the road for the purpose of repairing and maintaining an adjacent canal. Even if the evidence had shown an existing easement on the Fire Road belonging to a public entity who maintained the road for fire control purposes, the long history of use of the well-defined Fire Road by a diverse group of hikers entering and leaving a network of trails on a public wilderness area would be sufficiently adverse to establish a public trail easement by implied dedication.[3] As I explain below, substantial evidence established that public easement over the entire trail.
*1048 Contrary to the majority’s assertion (maj. opn., ante, at p. 1033), we are aware of no case (and the majority cites none) which holds that an owner can remove a road that has been impliedly dedicated to the public. This dualism is another example of the arbitrariness of the majority decision. No principled basis exists for the majority’s conclusion that no matter how substantial the public use of the Trail during the dedication period, the existence of the Fire Road prevents implied dedication to the public of the lower portion of the Trail. This conclusion is a glaring departure from existing precedent.
II. Substantial evidence supports public dedication of the Peak Trail.
To conclude that the use of the Peak Trail was “miniscule” and therefore insufficient to establish implied dedication, the majority states: “The issue is not whether the trail was used enough to retain its character as a trail, but whether the use was substantial enough to indicate to the owner that his property was in danger of being dedicated.” (Maj. opn., ante, at pp. 1035, 1036.) The majority requires more of respondents and the trial court than the law demands. As Gion, supra, 2 Cal.3d 29 explained, litigants seeking to show implied dedication must show only that the public has used the land as they would have used public land for the use the litigants seek to establish, in the case of a beach or shoreline, “as if it were a public recreation area,” and in the case of a road, “as if it were a public road.” (Id. at p. 39.) Friends needed to show that the public used the Peak Trail as if it were a public hiking trail, not, as the majority would require, that the use met some otherwise unspecified standard. Testimony established that during the dedication period hikers regularly traversed the Peak Trail as if it were a public hiking trail, and historical aerial photographs showed the hikers’ use made the Peak Trail visible. Under the majority’s standard, even if (as here) a trail was used sufficiently “to retain its character as a trail” (maj. opn., ante, at p. 1036), that use could not establish public dedication. As Blasius, supra, 78 Cal.App.4th 810 pointed out, the inference of public use is available “as to recreational pedestrians in rural areas,” including when the evidence shows hiking on an isolated property: “ ‘ “No Trespassing” signs may be sufficient [to demonstrate a bona fide attempt by the landowner to prevent public use] when only an occasional hiker traverses an isolated property . . . .’ *1049 (Gion-Dietz, supra, 2 Cal.3d at p. 41.) The owner would have no occasion to rebut the finding of ‘adverse’ public use unless that inference were available.” (Blasius, at p. 825.)
The majority’s conclusion that sufficient evidence did not establish use of the Peak Trail also violates the fundamental substantial evidence rule. When an appellant attacks a court’s finding as not sustained by the evidence, ‘“the power of an appellate court begins and ends with the determination whether there is any substantial evidence, contradicted or uncontradicted, which will support the verdict. Questions of credibility must be resolved in favor of the factfinder’s determination, and when two or more inferences can reasonably be drawn from the evidence, a reviewing court may not substitute its deductions for those of the trier of fact. If on any material point the evidence is in conflict, it must be assumed that the court . . . resolved the conflict in favor of the prevailing party.” (Abar v. Rogers, supra, 23 Cal.App.3d at p. 510.) By analogy, where the law of implied dedication would only require proof that for the prescriptive period various sandlot baseball games occurred regularly and frequently on private property, the majority seemingly requires proof of team rosters (with a full team of at least nine players on each side), uniform colors, and evidence of games year-round with no off-season and no rain outs.
At every turn, the majority construes the evidence against Friends, the prevailing party, belittles and minimizes the uncontradicted testimony of the legacy hikers, and fails to mention other evidence in the record supporting the trial court’s findings. I begin with the majority’s statement that a number of the trial court’s specific findings are unsupported in the record. (Maj. opn., ante, at p. 1035.) To the contrary, each of the findings is supported by substantial evidence.
First, the trial court found: ‘“Several of the legacy hikers hiked the Trail during each of the years from 1962 to 1972.” The majority asserts that this is wrong because only one legacy hiker testified he hiked the Trail every year from 1967 to 1972. (The relevant time period is Mar. 4, 1967, to Mar. 4, 1972.) The trial court stated only that in each year, several hikers hiked the Trail, not that several hikers hiked the Trail every year.
Second, the trial court found: ‘“Most of the legacy hikers regularly hiked from the bottom of the Trail at Lake Drive all the way to the peak.” Four legacy hikers testified they regularly hiked all the way to the peak. James Goller stated he and his father ‘“[just about] all the time” went up to the medallion at the peak, and when he hiked with the Cub Scouts they would go all the way to the top too. Frederic Harris and Carole Hemingway hiked to the peak once or twice a week in the summers of 1971 and 1972. Cynthia *1050 Foran hiked to the medallion at the peak in 1971 six or seven times with her brothers and with friends. The trial court’s conclusion is amply supported by the testimony of four of the seven legacy hikers.
Third, the trial court found: “From the testimony and the court’s own observation of the Trail, the peak, with its survey marker, is the logical and obvious destination for any hiker on the Trail.” It is undisputed that at the time of the trial court’s visit to the site of the Trail and during the years from 1967 to 1972, a medallion marked the top of the Peak Trail. Harris testified that there was a marker at the peak of the trail. Hemingway testified that she and Harris often hiked up to the medallion, and the medallion was “a place where we would say, okay, let’s go back down again.” Goller testified he remembered finding the medallion unusual and asking his father about it, and reaching the medallion was the challenge of hiking the trail. Foran testified that at the highest point of the trail there was a medallion in the ground. Paul Edelman, who worked as chief of natural resources and planning for the Santa Monica Mountains Conservancy and also worked for the MRCA, testified that the peak of the Trail was a “key resource[]” of Franklin Canyon Park because it allowed the public to hike up high enough to get the view. Keith Lehrer, who hiked the trail in 1965, testified that he, his friend, and his friend’s father would hike all the way up for the 360-degree view at the medallion, which his friend’s father “jokingly referred to it as something from the space aliens .... [¶] ... [¶] It was a big event when we went to the space marker.” A marker at the peak of a trail is a logical and obvious destination for hikers, as it was for the majority of the legacy hikers testifying at trial.
Fourth, the trial court found: “Most legacy hikers testified . . . that the other hikers were seen throughout the trail,” and “a substantial number of the other hikers were hiking to the peak too.” Harris testified that he saw half a dozen to a dozen people when he hiked the Trail, and he saw the same number of people on the Peak Trail. Hemingway testified she consistently encountered between a dozen to 15 or 20 other people on the Trail (including groups with a leader) on the course of her entire hike and “going all the way up.” Goller testified he almost always saw eight to 20 people on his entire trip going up and down, including groups of six people. On direct and cross-examination, Foran testified she saw “two to four” others on the entire area of the Trail each time she hiked.
Additional substantial evidence supported travel over the Peak Trail. The trial court concluded that Friends’ aerial photography expert, Brian Bradshaw, was credible when he testified that aerial photography during the implied dedication period showed a trail leaving the Fire Road and heading north to the peak and that the lack of vegetation showed usage of the Peak Trail. The *1051 majority’s complaint that “no evidence suggested how much or what kind of use was necessary to prevent the trail from becoming overgrown” (maj. opn., ante, at p. 1036) refuses to credit the trial court’s factual finding because Hadid did not meet his burden to challenge it. Although Robert Pope, Hadid’s aerial photography expert, testified that he did not see a defined trail, I defer as I must to the trial court’s finding that Bradshaw was credible, and the trial court was entitled to resolve conflicts in the evidence. Even Pope did not dispute that a variety of people could have hiked up to the peak and the medallion in 1968 to 1971 or thereabouts.
The majority opinion misapplies the law, jettisons its obligation to construe the evidence in favor of the prevailing party, and misconstrues the record. Strong precedent and sufficient evidence support the trial court’s findings regarding the Peak Trail.
III. Substantial evidence supported the public dedication of the Fire Road.
Justice Chaney’s concurrence requires evidence of uniform use of the Fire Road, in direct conflict with Gion, supra, 2 Cal.3d 29. The concurrence admits that it was reasonable for the trial court to infer substantial use of the Fire Road on the weekends, but concludes that the court could not infer similar use during the week. (Cone. opn. of Chaney, J., ante, at p. 1040.) This approach would require that testimony establish that the same number of hikers were on the Fire Road every day of the year regardless of the season. Evidence of uniform and uninterrupted use by the public is not required to establish implied dedication. In Gion, the court described evidence showing large numbers of people on Navarro Beach “at times,” and visits by schoolchildren “during good weather,” and expressly rejected the concurrence’s approach: “If the fee owner proves that use of the land fluctuated seasonally, on the other hand, such a showing does not negate evidence of adverse user. ‘[The] thing of significance is that whoever wanted to use [the land] did so . . . when they wished to do so without asking permission and without protest from the land owners.’ ” (Gion, at pp. 37, 40.) While Justice Chaney admits that weekday use of the Trail would naturally be lower, the concurrence errs in drawing that inference against the trial court’s finding. (Cone, opn. of Chaney, J., ante, at p. 1040.) A landowner may have constructive notice of public use of his or her property when that public use ebbs and flows with the rhythms of daily life and the seasons, and the evidence need not establish that the amount of use never varied.
Blasius, supra, 78 Cal.App.4th 810 described testimony by witnesses that the canal access road was used “ ‘by various people, young and old, families and single persons, friends, guests, visitors and strangers’ ” including school age children, without specifying days of the week, time of day, seasons, or *1052 the number of people on the road. (Id. at p. 819.) Similarly, the Fire Road was hiked by various people, young and old, families and single persons, friends, guests from out of town, and visitors, including Cub Scouts and children hiking with their siblings and with parents. Blasius explained that ‘“[t]he central question concerns ‘adversity’—whether ‘persons have used the land as they would have used public land.’ ” (Id. at p. 824.) The testimony here showed that the hikers used the Fire Road as they would have used a public trail, for hiking and dog walking. In reviewing the landowners’ argument that “there is not sufficient evidence to satisfy the Gion-Dietz[, supra, 2 Cal.3d 29] criteria,” the Blasius court explained: “[T]he critical question of fact [is] whether the use shown to have been made of the property by the public is ‘ “such that the trier of fact is justified in inferring an adverse claim and user and imputing constructive knowledge thereof to the owner.” ’ ” (Blasius, at pp. 824-825.) Emphasizing that the testimony showed (as it did in this case) that the public used the road in the belief they had the right to do so, the court observed: “While the anecdotal evidence of such use is inherently difficult to reduce to a precise traffic count, the testimony of the witnesses of their use and observation of others’ use affords an inference that such use was far from rare; in the words of the trial court it was ‘continuous, regular and open use.’ ” (Id. at p. 825.) Here, no precise traffic count must be calculated from the hikers’ testimony to conclude that the trial court could infer the hikers’ use of the Fire Road was “open, visible, and notorious.”
Blasius, supra, 78 Cal.App.4th 810 also cautioned that “fact patterns are myriad and the question often imbued with overtones of local norms, customs, and expectations. That is one reason why such cases, unless clearly outside the range of discretion, generally warrant deference to the local finder of fact. [¶] The Gion-Dietz[, supra, 2 Cal.3d 29] opinion plainly contemplates that ‘adversity’ for purposes of implied dedication may arise as to recreational pedestrians in rural areas.” (Blasius, at p. 825, italics added.) Testimony established “a long history of continued passage by a diverse group of occasional hikers across a well defined privately owned trail segment,” the Fire Road. (Id. at p. 826, fn. 7.) As in Blasius, the trial court herein did not abuse its discretion when it found that the level of use was sufficient to convey to the landowners during the relevant time that the use was adverse within the meaning of Gion. (Blasius, at pp. 825-826.)
The concurrence also misapplies the rule of substantial evidence. “[W]e ‘must accept as true all evidence tending to establish the correctness of the finding as made, taking into account, as well, all inferences which might reasonably have been thought by the trial court to lead to the same conclusion. Every substantial conflict in the testimony is ... to be resolved in favor of the finding.’ ” (Hanshaw v. Long Valley Road Assn. (2004) 116 Cal.App.4th 471, 481 [11 Cal.Rptr.3d 357].) Justice Chaney minimizes the hikers’ testimony and makes every inference against the finding of the trial court that use *1053 of the Fire Road was sufficient for implied dedication. Goiter testified that he hiked the Trail on Sunday mornings with his father, and he also testified that he hiked the Trail six times with the Cub Scouts and later, when he was in his early teens, he hiked the Trail many times in the afternoons with friends. The reasonable inference is that Goller did not hike only on Sundays, and the trial court could infer that he hiked the Trail during the week. Justice Chaney acknowledges that Harris and Hemingway hiked during the week, but states that Joan Carl, Foran, and Richard Saul did not specify which days they hiked, and then infers that they did not use the Trail on weekdays, making an impermissible inference against the trial court’s findings. (Cone. opn. of Chaney, J., ante, at p. 1040.) Justice Chaney fails to mention that that on weekdays Harris and Hemingway saw between six to 12 parked cars at the trailhead and that Foran also saw cars parked at the bottom, as the trial court noted in its statement of decision.
Finally, Justice Chaney discounts the testimony of the hikers regarding their experiences as minors, because minors are “born trespassers” and would not have a reasonable belief that they had a right to walk on the Peak Trail. (Cone. opn. of Chaney, J., ante, at p. 1041.) This is an unsupported assumption, and ignores that the hikers who hiked the Trail when they were minors testified that they believed the Trail was public property and that they had a right to hike it. Evidence of use by minors is relevant to establish implied dedication. In Burch v. Gombos, supra, 82 Cal.App.4th 352, one of the three witnesses who testified used the fire road only as a teenager. (Id. at p. 357.) Testimony of use by children also was in evidence in Gion, supra, 2 Cal.3d at page 37 and in Blasius, supra, 78 Cal.App.4th at page 819. On behalf of all young people, I object to this dismissive and broad characterization. Clearly, if our courts have determined that minors may be competent witnesses in the most sensitive of cases, it is reasonable to assume that they can possess the awareness to form an opinion as to whether they have a right to occupy a particular space. Make no mistake, Justice Chaney’s concurrence would make a new credibility finding—contrary to that of the trial court— based solely upon a stereotype having no basis in the record or the law. That is not the province of appellate review.
IV. The trial court did not have the power to relocate the trail easement.
Presiding Justice Rothschild’s conclusion that the trial court had the power to consider an equitable relocation of the Trail has no support in California law or evidence in the record. (Cone. opn. of Rothschild, P. J., ante, at p. 1037.) The trial court properly recognized that under our Supreme Court precedent, once the Trail was established by implied dedication, the court had no power or obligation to allow Hadid not to respect the easement established by implied dedication. Further, Hadid did not request relocation of the Trail *1054 during trial, and no evidence at trial supported relocation of the Trail easement. As the trial court explained in its statement of decision: “Defendants . . . request a finding as to whether the easement would ‘deprive Defendants [of] the ability to develop [the property].’ That is not an element of a cause of action for implied dedication and is irrelevant. When Defendants acquired the property, they took subject to whatever easements and encumbrances had been created by prior owners. The court makes no ruling on Defendants’ development plans, except that the public easement must be respected.” The court addressed the merits of Hadid’s affirmative defense of laches (the only affirmative defense for which he presented evidence), and after thoughtful discussion, rejected it. The trial court continued: “Even if Defendants had alleged the equitable affirmative defenses (and assuming the defenses apply in the implied public dedication context), Defendants are simply not in an equitable position. Defendants’ alleged ‘hardship’ did not arise until the 21st century. Plaintiffs’ rights to a public recreational easement accrued in 1972. Defendants’ claim is 40 years too late. As stated in Gion, supra, [2 Cal.3d] at [page] 44: ‘Nothing can be done by the present owners to take back that which was previously given away.’ Nor is compensation part of the analysis,” which in this case was not required by equity.
The trial court was correct. Our Supreme Court has not hesitated to apply Gion, supra, 2 Cal.3d 29 even when implied dedication to the public deprived the owners of any possibility of developing the property. In County of Los Angeles v. Berk (1980) 26 Cal.3d 201 [161 Cal.Rptr. 742, 605 P.2d 381] (Berk), quoted by the trial court, the county and the City of Torrance brought separate actions to establish a “ ‘public beach recreation easement’ ” on oceanfront property owned by Oscar and Shirley Berk. (Id. at p. 206.) After Berk drew up plans for an apartment complex, the cities of Torrance and Redondo Beach each advised him that his plan would require no variances. Berk purchased the property, and with a permit from Redondo Beach, he began construction in February 1971. When he applied for a building permit in Torrance, however, the city filed an action to quiet title to public recreational easements, and the county filed its own action regarding the Redondo Beach portion of the property. (Id. at pp. 208-209.) Gion had been filed more than six months before he opened escrow on the property, but Berk learned of it only after escrow had closed, and no one in either city had advised him of the decision or its effect. (Berk, at pp. 209-210.)
The trial court found an easement arising out of implied dedication for public recreational purposes over the entire property, rejected the affirmative defenses of laches and estoppel, and denied Berk’s cross-complaint for damages. (Berk, supra, 26 Cal.3d at pp. 210-211). Before the California Supreme Court, Berk argued (among other arguments) that fundamental fairness (including laches and estoppel) barred the result reached in the trial court. (Id. at p. 212.) In rejecting the application of estoppel and laches, the *1055 court explained: ‘“[A]ny reliance by the Berks on the actions of the governmental entities here involved was clearly unreasonable. It simply cannot be maintained that an existing or prospective property owner, upon being advised by planning and building officials that a given project complies with applicable local codes, thereby gains the right to proceed with that project regardless of the rights of third parties or the public in the property on which it is proposed to be built.” {Id. at p. 221.) Further, “the owner of property or one proposing to acquire it cannot justify his ignorance of the true state of the facts and the law affecting it by pointing to similar ignorance in government bodies. Negligence . . . cannot be so easily excused in one whose interest is focused upon a particular piece of property.” {Ibid.)
“[A]s prospective purchasers of the subject property, [the Berks] had at their disposal ample means of informing themselves of all of the considerations, legal and otherwise, which might have had an effect on the wisdom of their decision. Rather than availing themselves of the full range of these means, however, they apparently chose to limit their inquiry to those considerations relating to the feasibility of proceeding with their plans in light of applicable zoning and building codes. In so doing they wholly neglected to inform themselves on the current state of the common law and its possible effect on the property they proposed to purchase.” (Berk, supra, 26 Cal.3d at p. 223.) Like Berk, Hadid had ample means of informing himself of all the considerations relevant to his purchase of the property, but limited his inquiry to examining the title and making physical inspection of the property. Hadid stated that until this lawsuit, he had never heard of a public recreational easement, thus showing that he neglected to inform himself on the common law’s possible effect on the property.
In Gion, supra, 2 Cal.3d 29, as in this case, “[t]he present fee owners of the lands in question have of course made it clear that they do not approve of the public use of the property. Previous owners, however, by ignoring the wide-spread public use of the land for more than five years have impliedly dedicated the property to the public. Nothing can be done by the present owners to take back that which was previously given away.” (Id. at p. 44, italics added.) “Nothing” means the trial court could not move the Trail to suit Hadid, just as the trial court would be without power to move the Trail to make the route better for hikers. Berk, supra, 26 Cal.3d 201 makes clear that prospective purchasers must inform themselves not only of what appears on recorded instruments and in local codes but also of the possible effect of the common law.
Presiding Justice Rothschild’s suggestion that public policy favors development of the land is irrelevant, and flies in the face of the entire history of implied dedication to the public. (Cone. opn. of Rothschild, P. J., ante, at *1056 p. 1038.) I take exception to Presiding Justice Rothschild’s contention that an alternative trail combined with home development would be a “win-win situation” for all parties. (Cone. opn. of Rothschild, P. J., ante, at p. 1038.) Under her scenario, the public would still lose the extant historical Trail. The equities in this case do not balance equally. The interests of a few buyers of Hadid-constructed homes[4] and of Hadid himself are not equivalent to the public’s interest in preserving the historical Trail for future use by generations to come.
As Presiding Justice Rothschild concedes, no evidence supported a relocation of the Trail. (Cone. opn. of Rothschild, P. J., ante, at p. 1037.) Hadid did not allege a hardship defense, and offered no evidence at trial regarding the relocation of the Trail. Hadid did not testify that he could not develop his land if the Trail remained, and did not testify regarding any other hardship or relocation.
Contrary to the majority’s assertion on page 1022, ante, the defense expert in surveying and grading, Ken Shank, testified that he had never been asked by Hadid to reroute the Trail, and even if it were rerouted “there’s really no practical place to put it if you’re going to develop land over in this area.” The only evidence at trial was that the Trail could not be relocated to minimize its effect on development. Hadid first raised the issue of relocation in his objections to the court’s proposed statement of decision, attaching a declaration from Shank proposing an alternative easement (and contradicting Shank’s trial testimony that no alternate route was practical). The trial court sustained Friends’ objection to the declaration. After entry of judgment, Hadid’s declaration attached to his motion for new trial stated that he had proposed an alternative easement to Friends during settlement discussions. The evidence of a settlement offer was inadmissible in the trial court under Evidence Code section 1152, subdivision (b). Just as the record contains no competent evidence regarding the status or provenance of the Fire Road, the record contains no competent evidence supporting relocation of the Trail. Moreover, Presiding Justice Rothschild’s insistence that the trial court had the power to alter a trail whose public dedication vested more than 44 years ago reflects a troubling disregard for the permanence of public dedication once it has occurred. There are no do-overs 44 years later. Mohamed Hadid no more had a leg to stand on when he belatedly requested equitable rerouting of the Trail than the trial court had the legal basis to contemplate such relief, once it had determined that implied dedication had vested by 1972.
*1057 The majority and the concurrences have done for Mohamed Hadid what he and his lawyers could not do in the trial court, by minimizing and disregarding the detailed and credible testimony of civic-minded citizens who knew and enjoyed the Trail at least three decades before Hadid saw the land as ripe for development and profit, and by disregarding settled precedent and creating new law.
CONCLUSION
The late Senator and statesman from New York, Daniel Patrick Moynihan, frequently observed: “ ‘[Y]ou are entitled to your own opinion, but you are not entitled to your own facts.’ ” (Penny, Facts Are Facts (Sept. 4, 2003) National Review, at p. 1.) I would humbly add to that: And not your own law either.
This axiom, which applies equally to kitchen table discussions, academic and political discourse, and appellate review, is part of our societal fabric and underlies our faith in the judicial process.
I, therefore, must respectfully dissent. I would affirm the judgment and the order awarding attorney fees to Friends of the Hastain Trail and Mountains Recreation and Conservation Authority.
A petition for a rehearing was denied August 24, 2016. Johnson, J., was of the opinion that the petition should be granted. The petitions of all respondents for review by the Supreme Court were denied October 12, 2016, S237073.

 As I explain below, nothing in the record indicates when or if the road has been under the auspices or control of any public agency.

 No fire department is a party, and there is no evidence of any public entity seeking to prevent the public from hiking on the fire road. The two legacy hikers asked whether they ever saw fire vehicles on the fire road testified that they saw none.

 The majority’s conclusion that Blasius. supra. 78 Cal.App.4th 810 does not apply because the description of the Hastain Trail easement (as stipulated to by the parties) in an exhibit to the judgment included the metes and bounds is puzzling. (Maj. opn., ante, at p. 1033.) A metes and bounds description in a judgment does not change the nature of the easement, but rather determines the exact contours of the public right of way. In Western Aggregates. Inc. v. County of Yuba (2002) 101 Cal.App.4th 278, 307 [130 Cal.Rptr.2d 436], the court affirmed the trial court’s finding of a historical public road on private property, but remanded for a determination *1048 of the metes and bounds to establish the exact route and width of the public road “as . . . necessary to define the public road now running” through the private property. The majority’s conclusion is also speculative. The appellate opinion in Blasius does not include the entire judgment, which very well may have included a precise description of the easement in metes and bounds. (Blasius. supra. 78 Cal.App.4th at pp. 819-820.)
Further, if the irrigation district in Blasius constructed another canal elsewhere, there is no reason why the public could not continue to use the impliedly dedicated public easement on the road adjacent to the former canal after the district no longer maintained the road.

 Mohamed Hadid testified that he had been a developer worldwide for 40 years, and after moving to Southern California in 1991 he had developed commercial buildings and mega-mansions (homes from 15,000 to 60,000 square feet).